235 So.2d 657

Hershel Wayne BERRY, the Father of Regenia Fay Berry, Deceased

v.

W. C. ROBERTSON.

7 Div. 820.

Supreme Court of Alabama.

April 9, 1970.

Rehearing Denied May 28, 1970.

Clark E. Johnson, Jr., Albertville, for appellant.

Dortch, Allen, Wright & Wright, Gadsden, for appellee.

PER CURIAM.

Appeal by plaintiff from adverse verdict, directed for defendant without hypothesis, by the trial court following the closing of plaintiff's case. Defendant offered no evidence.

The complaint was in three counts, 5, 6, and 7, all charging malpractice in the treatment of plaintiff's minor child, who died in the hospital following aspiration of a bean or pea into its right lung. Demurrers were sustained to Counts 1, 2, 3, 4, 8, and 9. At the conclusion of plaintiff's evidence the defendant rested and requested in writing the general affirmative charge with and without hypothesis as to Counts 5, 6, and 7, which the court gave. The court also orally charged the jury that the form of your verdict will be "We the Jury find the issues in favor of the Defendant."

### The Facts.

On December 29, 1964, Regenia Fay Berry, age 22 months, the child of plaintiff, was playing in the kitchen and got hold of some dry beans. The mother noticed the child in some distress, and observed the beans in the child's hand and mouth. By turning the child bottom side up and shaking her, some of the beans came out, but the child had difficulty getting her breath. The mother carried the child to her mother-in-law's home close by, where further efforts to clear up the child's breathing distress were unsuccessful. They went to the City of Albertville and to the office of Dr. B. N. Lavender. The physician examined the child, heard the history, advised the mother that the child had apparently aspirated one of the beans and he was unable to assist them, suggested the services of one qualified to assist, and recommended that the child be carried to Gadsden to a hospital. The child was carried to the emergency room of Holy Name of Jesus Hospital in Gadsden by the mother and her husband's employer, Mr. Hudson. The defendant, Dr. Robertson, later went to the emergency room and examined the child. X-rays had been made prior to the arrival of the defendant. Thereafter, defendant informed the mother that the X-rays indicated a foreign body in the right branch of the child's lungs. He explained to her that he was going to prescribe a shot for the child to make her rest. The next morning before noon, defendant, with the assistance of another doctor, would attempt to remove the object from the child's lung. At this time, the child was wheezing. The mother took the child to the fifth floor. A bed, with a tent and oxygen tank, was provided. Later, and after defendant had apparently left the hospital, the child had a choking spell and the mother requested assistance from the nurse at the desk. Shortly thereafter, Dr. Turnage, the anesthetist, scheduled to assist the defendant

the next day in performing the operation, came into the room. The nurse had given the child a shot and Dr. Turnage also gave her a shot. Thereafter, the child went to sleep and slept normally in the croup tent until after five o'clock 'the next morning. About five o'clock on the morning of December 30, the child woke up and called its mother and died immediately. Artificial respiration was attempted but was unsuccessful. Dr. Robertson went to the hospital and talked to the mother and other members of the family present. He requested permission to perform an autopsy. The request was refused by the parents.

Following the jury verdict and judgment entered for the defendant, plaintiff filed a motion for new trial. This motion, presenting 30 separate allegations of error, was overuled. There are here 55 assignments of error, many of them referring (again) to (individual) grounds presented in the motion.

Appellant, in brief, states he "has three main contentions for reversal." He then lists: First, the giving of the affirmative charge as to Counts 5, 6, and 7; second, the ruling of the court in sustaining demurrers to Counts 3, 4, 8, and 9; and, third, the rulings of the court on questions asked Dr. Norman, an expert witness presented by the plaintiff.

### The Pleadings.

Count 5 recites as follows:

### "COUNT V

"The plaintiff, the father of Regenia Fay Berry, a minor of the age of 22 months, claims of the defendant the sum of $250,000.00 as damages for that heretofore on, to-wit: December 30, 1964, the defendant was a physician and surgeon practicing in Etowah County in the State of Alabama, and that the plaintiff's minor child had aspirated a bean, pea or similar vegetable object and that the defendant, as such physician and sur-

geon, undertook to treat and care for the plaintiff's said minor child for said condition, for hire or reward, and that it then and there became the duty of the defendant to exercise due care, skill and diligence in said care and treatment of the plaintiff's minor child but, notwithstanding said duty, the defendant so negligently conducted himself in that manner that as a proximate consequence or result of the defendant's said negligence the plaintiff's minor child died; for which the plaintiff claims damages as provided by law."

■ Counts 6 and 7 are similar to 5 and charge negligent failure to treat the child. We do not find it necessary to set out the verbage of the rejected counts. All appear to be defective and subject to the demurrers interposed. Furthermore, no injury resulted and it appears from the whole record that plaintiff, under Counts 5, 6, and 7, was able to introduce all evidence surrounding the entire incident. We find no error here to reverse. Miller v. Mutual Grocery Co., 214 Ala. 62, 106 So. 396.

### Rulings on Admission of Evidence

### Assignments of Error 28, 29, 30, 31, 32, and 33.

These assignments allege error in sustaining objections to questions propounded to plaintiff's witness, Grady Hudson.

The court sustained objection to the following question propounded to the witness Grady Hudson:

"Q Now, on the way down describe the breathing or symptoms displayed to you by the child?"

■ The inclusion of the word "symptoms" would ordinarily call for medical diagnosis and the witness, a layman, was not qualified to answer. We hold the ruling of the court was proper.

Objection was also sustained to the question:

"Q What sound did the child make when it breathed?"

We notice that the witness answered a previous question:

"Q Now, just tell what you noticed about the child.

"A Occasionally when it would breathe it would sound like it had a cold just like a baby would sound if it had a cold."

So, to some extent the question was repititious.

We know that before leaving Gadsden the child had been examined by Dr. B. N. Lavender, who testified fully as to the condition of the child when he saw her at that time.

The mother, who held the child in her lap during the trip to Gadsden, testified with reference to the child's condition during the trip.

■ We hold there was no error to reverse in the ruling of the court.

■ The third question related to a conversation about "arrangements for the operation—what was said about the financial arrangements—" The court sustained the objection. This was without injury to the plaintiff for all of this evidence was later admitted without objection in the testimony of Mrs. Berry.

"Any error in admission of evidence was rendered harmless by other evidence to same effect admitted without objection." Harvey Ragland Co. v. Newton, 268 Ala. 192, 105 So.2d 110.

*Assignments of Error 34 to 53, Inclusive.*

These assignments are argued in bulk and relate to alleged errors in rulings by the court on questions propounded to plaintiff's witness, Dr. Joe Norman.

It should be noted here that Dr. Joe Norman testified at length, with the witness being turned over to opposing counsel on voir dire on four separate occasions.

Objection was sustained by the court to the following question:

"Q * * * Doctor, assume that a twenty-one or twenty-two month old female child weighing between twenty or twenty-five pounds aspirated a bean into its air passages and that the bean lodges in the right bronchus, what is the condition of such a child, Doctor?"

Objection was also sustained to the following question:

"Q * * * Doctor, what reaction occurs if any action does occur when a bean is inhaled into the air passages of a twenty-one month old or twenty-two month old female child?"

Again, objection was sustained to this question:

"Q * * * Upon a child aspirating a bean, a child twenty-one or two months old, what in your judgment or opinion is the medical condition of such a child?"

Objection of counsel to all three questions embraced the argument that because the witness was not familiar with the care and skill of physicians and surgeons in the same neighborhood (Gadsden, Alabama) pursuing the same general line of practice —the witness could not qualify and be allowed to give expert testimony unrelated to location, and in no way relating to standards of practice or treatment required. The witness had answered that he was not familiar with the practice of medicine in that particular community.

The evidence showed Dr. Joe Norman was a graduate of the University of Alabama Medical College. Thereafter, he was a senior teaching resident in medicine at Boston University. Later, he went to Harvard Medical School and Massachu-

.setts General Hospital where for three years he was a resident and Fellow in pulmonary diseases. He returned to Birmingham to be Chief Resident Physician in medicine and then joined the staff of the University Medical College. He was licensed to practice medicine in the State. During this period, he had performed the operation of bronchoscopy in removing foreign bodies in air passages approximately 250 times.

We feel the court's ruling in sustaining the objections to the three questions was incorrect—that the so-called "same locality" or "same general neighborhood," rule would not apply to questions of this nature.

After local counsel (Mr. McCord) took over the direct examination, the doctor was later asked and permitted to answer fully the same or similar questions without objection. We quote from the record.

"Q How many different times have you seen objects taken from the lungs of children by the bronchoscope?

"A (Witness contemplating)

"Q I know you wouldn't know the exact number, but—

"A Sir, around two hundred.

"Q About two hundred. Have you observed as a practitioner of medicine as applied to pulmonary diseases the reactions in the children with foreign objects in their lungs?

"A Yes, sir, I have.

"Q Are you familiar with what occurs when the foreign object gets in the lung and stays there for sometime?

"A Yes, sir, I am.

"Q Are you familiar with what happens to say a dry bean that would get into a child's lungs?

"A Yes, sir.

"Q Can you tell us—do you think you know the reaction on the child and on the tissue and on the bean?

"A Yes, sir, I think so.

"Q You think you would?

"A I do.

"Q You do know, absolutely?

"A Yes, sir.

"Q All right."

And also we find:

"Q What is the most dangerous object you can have in a child's lung?

"MR. CHARLES WRIGHT: We object to that, if the Court please.

"Q In your opinion as a teacher and as a student of these matters with these degrees that you have got.

"THE COURT: Yes, I will overrule it.

"MR. CHARLES WRIGHT: We except.

"A Would you repeat the question, please, sir?

"Q What, in your opinion, is one of the most dangerous objects for a child to aspirate into its lung?

"THE COURT: Do you renew your objection?

"MR. CHARLES WRIGHT: Yes, sir.

"THE COURT: I will overrule it.

"MR. CHARLES WRIGHT: We except.

"A I would say that vegetable material, sir.

"Q Such as what, name some of them?

"A All forms of food, corn, beans—this is, of course, * * *.

" * * *.

"Q You say that one of the most dangerous things that a child can aspirate into its lungs is a bean, is that right?

"A Yes, sir, that is correct.

"Q All right, sir, will you explain to the Court why?

"A Well, in the first place—

"THE COURT: Speak up.

"A In the first place the statement about aspiration of a bean as a vegetable matter causing a vegetative bronchitis as taken from the textbook of Chevilar Jackson on bronchoesophagoscopy, it is recognized as— that aspiration of a bean is dangerous. It's dangerous because if the bean is small enough and with each effort the individual makes to expel it it becomes further lodged in the respiratory system. Subsequent to this there is an effort to expel it by coughing or wheezing. There is a generalized reaction not only of the area into which the material has been aspirated, but by the lung—the other parts of the lung.

"Then after the individual—after this acute reaction subsides then the matter—then the vegetable material usually swells and becomes lodged.

"Q Now, have you observed that on children?

"A Have I actually seen one swell? No, sir.

"Q Have you actually seen beans in their bronchial tubes?

"A Yes, sir, I have.

"Q And you say that beans swell, is that right?

"A Yes, sir, that is correct.

"Q State whether or not that endangers the life of the child?

"A I couldn't say that, sir, without having examined the child that you talk about.

"Q Well, in an ordinary way would the beans in a child's bronchial tubes be a dangerous situation or not, in your opinion as a medical expert?

"A I think that it is recognized that a foreign body in the lungs is a dangerous situation.

"Q And you say one of the most dangerous is a bean?

"A Yes, sir, that is correct.

"Q For the reasons that you have explained?

"A Yes, sir.

"Q What is the general recognized course of medical treatment for that condition?

"A Of an aspirated bean?

"Q Yes, sir.

"A What is the general recognized therapy—

"Q Yes, sir, yes.

"A Removal.

"Q How?

"A Removal by bronchoscopic removal."

We hold that any error in the original ruling of the court in sustaining the objections to the questions first propounded to the witness was cured by the admission of the evidence above quoted.

### Assignments of Error 54 and 55.

Objection was sustained to plaintiff's offer to introduce Exhibit "X", being a part of a compendium, Cyclopedia of Medicine, edited by John Moyer, a surgeon. The part offered deals with effects and reactions of individuals who have vegetable substances in their lungs. It should be noted here that the author of Exhibit "X" was Dr. Chevilar Jackson.

We recognize the general principle that a treatise, essay, or pamphlet on a

subject of science which is testified to by an expert as being a standard and trustworthy on the subject, is admissible. Law of Evidence in Alabama, McElroy, 2nd Edition, Vol. 2, pages 268-9.

"But relevant extracts from medical treatises are not in themselves self-proving, but are admissible only when recognized and approved by the medical profession as standard. * * *" Smarr v. State, 260 Ala. 30, 36, 68 So.2d 6, 12.

■ We hold that the writing offered, (Exhibit "X"), was sufficiently identified as being written by a recognized authority in the field of medicine here considered. The trial court erred in sustaining the objection. But is this error prejudicial to be reversible?

■ The peremptory charge was given for the defendant which we later approve on the basis of a total failure of proof of any negligence. The ruling now considered had no effect upon the result which would have been the same if the ruling had never been made, or if it had been just the opposite. Error must be prejudicial to be reversible. Rule 45, Rules of the Supreme Court of Alabama, 279 Ala. XXIII, XLI, XLII; Code of Alabama 1940, Title 7, Appendix; Hambaugh v. McGraw, 211 Ala. 550, 103 So. 646; Prestwood v. Thompson Co., 272 Ala. 547, 133 So.2d 215.

*Assignments of Error 11 to 23, Inclusive.*

These assignments deal with the giving of the general affirmative charge as to Counts 5, 6, and 7. The assignments include the alleged errors as set out in the motion for new trial.

While the defendant did not testify, parts of a deposition taken by plaintiff of the defendant were offered and read to the jury. In this testimony he related his examination of the child along with the diagnosis of the presence of a foreign body in the lung. He related the admission of the child to the hosptial and the scheduling of an operation for the following morning.

He discussed with Dr. Turnage, who was the anesthetist, that they would operate before noon. Further testimony dealt with the potential danger to a child under the conditions existing and the increase of danger if the foreign object was not removed. There was no evidence from the evidence presented by the parts of the defendant's deposition to warrant the submission of the case to the jury.

■ The burden of proof to establish negligence was and is upon the plaintiff. Proof of an unsuccessful or unfortunate result will not suffice to show that this injury was the result of negligence. The doctrine of res ipsa loquitur does not apply. Nor does the burden of proof shift by showing an unsuccessful result has attended the treatment of the patient by the physician. Snow v. Allen, 227 Ala. 615, 151 So. 468.

In Watterson v. Conwell, 258 Ala. 180, 183, 61 So.2d 690, 693, we said:

"* * * evidence which affords nothing more than mere speculation, conjecture or guess is not sufficient to warrant submission of the question of negligence to the jury. (Citation Omitted)

"And that where evidence is equally consistent with either the existence or nonexistence of negligence, the issue should not be submitted to the jury, and that the party who affirms negligence has under such circumstances failed to establish it. (Citations Omitted)"

We recently held in Parrish v. Spink, Ala., 224 So.2d 621, 623, that:

"Ordinarily, in a malpractice case, proof as to what is or is not proper practice, treatment, and procedure, can be established only by expert medical evidence. * * *"

Also, in Parrish v. Spink, supra, we held that in the absence of expert testimony to show some negligence, the jury could not know or conclude from common knowledge

that any negligence attended the operation (treatment).

The only witness qualified to give expert testimony relating to any evidence of delay or negligence resulting therefrom in deciding when to operate on the child, in an attempt to remove the foreign body, would not answer the question. He (Dr. Joe Norman) stated:

"* * * I would have to personally see the child, examine the child, make some measurements before I would act accordingly, before I would take some kind of action."

We hold there was no proof of negligence by expert testimony in this case and that the court properly directed a verdict in favor of the defendant.

The foregoing opinion was prepared by J. Edgar Bowron, Supernumerary Circuit Judge, and is adopted by the Court as its opinion.

Affirmed.

LIVINGSTON, C. J., and SIMPSON, COLEMAN, BLOODWORTH and Mc-CALL, JJ., concur.