Plaintiff and his wife brought an action alleging negligence and wantonness against the defendant, Tuscaloosa Orthopedic Appliance Company, Inc., in connection with the fabrication and application of a leg brace. The jury returned a verdict in favor of the plaintiffs. Defendant appealed. We reverse.
In 1941, plaintiff Edward W. Wyatt fell out of a tree and broke his back. He recovered to the point that he could walk until complications occurred in 1946, at which time surgery was performed on his back. After the surgery, gradual paralysis occurred in both legs until, in 1957, he completely lost his ability to walk. He then became confined to a wheelchair and has been paraplegic since that time.
Mr. Wyatt began experiencing problems with decubitus ulcers (pressure sores) in 1961. He was hospitalized for more than two months for treatment of decubitus ulcers on his buttocks and was again hospitalized in February of 1979 for a month for *Page 158 
treatment of decubitus ulcers over his hips and buttocks.
He was readmitted in May of 1979 for a four-month hospital stay. The hospital course included treatment with different types of medication, whirlpool baths, rotating air mattress, egg crate, sheepskins, and debridement of the wounds. Cultures of the wounds, change of antibiotics, and various combinations of medications were also tried. The treating physician, Dr. Herrod, stated in the discharge summary that
 "[The] patient's ulcers were [a] very vexing problem, as we got one improved somewhat another one seemed to break down. Several communicated along the sacrum in an infectious process. Finally after great effort the wound seemed to be improved except for one area where two rather distant sites connected by a large fistulous like tract."
Dr. Herrod requested that the home health care nurses of the Tuscaloosa County Health Department call on Mr. Wyatt to assist in the care of his decubitus ulcers. The nurses started calling on him at home in September of 1979 and came on a regular basis thereafter.
Mr. Wyatt was re-admitted to Druid City Hospital on March 27, 1980, for treatment of decubitus ulcers on both hips and over the presacral area. He was discharged on September 5, 1980, having stayed for over five months. The discharge summary of Dr. Herrod indicated that Mr. Wyatt had a dramatic worsening of his presacral ulcer. Numerous changes in therapy were made. Dr. Herrod stated, "After initial cleaning and frustrating tries at promoting closure of the large presacral ulcer, the flap was developed and swung to cover the ulcer. This broke down and again undermining of the ulcer took place." Again, numerous methods of treatment were attempted.
In March of 1981, Mr. Wyatt fell, injuring his leg. He went to see Dr. E.C. Brock, a Tuscaloosa orthopedic surgeon, on March 20, 1981. The patient had acute cellulitus of the left knee and a comminuted fracture of the left distal femur. Mr. Wyatt was admitted to Druid City Hospital on the same day for immediate treatment of the acute infection and the fractured femur. At the time of admission, the patient had multiple infected areas over the body, which Dr. Brock described as decubitus ulcers. Mr. Wyatt was treated with intravenous antibiotics from March 20 until about April 5 to clear up the cellulitus and get his 104° temperature down.
While Mr. Wyatt was in the hospital, Dr. Brock brought James (Buddy) Mason to Mr. Wyatt's room and introduced him as being the man who would put the brace on his leg. It was not discussed at that time what kind of brace would be applied.
Mr. Mason is the president of the defendant, Tuscaloosa Orthopedic Appliance Company, Inc. He is an orthotist and has worked for the past seventeen or eighteen years with all the orthopedic surgeons in the West Alabama area. Orthotics includes the fabrication and fitting of braces and casts suitable for a patient in keeping with the instructions of the physician.
Mr. Mason took courses in orthotics at Northwestern University, worked for years under a certified orthotist, and took other courses in the nature of continuing education in the field of orthotics over the past many years. He is certified by the Board of Certification of the American Orthotic and Prosthetic Association, having passed its examination and otherwise having met the requirements and qualifications to become a certified orthotist. The American Orthotic and Prosthetic Association is a national organization for orthotists, and certification by that organization qualifies Mr. Mason to do crippled children's work for the State of Alabama and vocational rehabilitation work for the Veterans Administration. He is the only such person certified to do that work in West Alabama.
When Dr. Brock discussed Mr. Wyatt's case with Mr. Mason on April 2, 1981, Dr. Brock orally prescribed a fracture brace to hold the left knee at 90 degrees and stabilize the fracture. Dr. Brock told Mr. Mason that he wanted the usual long leg fracture brace to treat a distal femoral *Page 159 
fracture and to immobilize the fracture. In Dr. Brock's opinion, Mr. Wyatt needed a long leg brace, and a fracture brace was the only option acceptable to the patient.
The day before the brace was applied, Mr. Mason came to Mr. Wyatt's room and took the necessary measurements. Mrs. Wyatt was present in the hospital room. When she saw the area of her husband's leg being measured, she complained to Mr. Mason that she did not think he could get in and out of bed if the brace were that high on his leg.
On April 4, Mr. Wyatt was taken to the Druid City Hospital operating room, where Mr. Mason fabricated the fracture brace and fitted it to Mr. Wyatt's left leg. When Mr. Wyatt complained about the brace coming up so high on his leg, Mr. Mason replied that it had to. The brace had metal pieces on each side of the knee, and Mr. Wyatt also complained that the metal would rub his other leg when he was in bed. This was discussed, and it was decided that a piece of sheepskin could be used to protect the other leg from irritation. The knee area of the brace was left open on the top so that it had a window in the knee. Mr. Mason explained to the patient how the brace should fit and cautioned him to be very careful about its being too tight or too loose because he was paraplegic. Instructions were also given to be careful about the brace constricting the groin area. Mr. Mason gave Mr. Wyatt further warnings and instructions on the brace and told him to watch for any kind of skin problems underneath it.
Mr. Wyatt complained in the operating room about the brace being high on his leg, because he thought it would cause him difficulty in getting in and out of bed, and also because he thought it would prevent him from sitting in his wheelchair. He had no concern at the time about the brace rubbing so as to cause a sore on his stomach, because he was not aware it could do so.
Mr. Mason came to Mr. Wyatt's room two days later and helped him get out of bed and into a wheelchair. Wyatt made no complaint about the brace at that time. In fact, Mr. Wyatt's only complaint about the brace at any time was that Mr. Mason put it up too high on his leg.
All of Mr. Wyatt's decubitus ulcers got worse while he was in the hospital for treatment of the broken leg from March 20 until April 7. In addition to the worsening of the existing ulcers, he developed new sores on his back and left elbow.
Dr. Brock saw the brace and checked it in the hospital. Mr. Mason had put what was ordered on the patient, and Mr. Wyatt was discharged on April 7.
Mr. Wyatt found a sore on his lower abdomen on or about April 23. The next day, Wyatt went to see Mr. Mason, who cut out or molded back a portion of the brace to further separate it from the sore. The sore was fully visible to Mason and was not under the brace, but was at the point where, when Mr. Wyatt folded his leg up toward his chest, the brace touched his abdomen. After the adjustment was made, Mason recommended that Wyatt go see Dr. Herrod to treat the sore.
Wyatt first complained to Dr. Brock of a brace problem four days later, on April 28. When Mr. Wyatt went to Dr. Brock's office, Dr. Brock sent the patient to Mr. Mason with instructions that more of the brace be cut out or rolled back away from the ulcer. This was done, and Mr. Wyatt then went to see Dr. Herrod for treatment of the ulcer. Dr. Herrod treated the ulcer and then sent him home with instructions to call the county health nurse for assistance.
Nurse Williams talked to Dr. Herrod, who described the ulcer on Mr. Wyatt's abdomen and also noted that the decubiti on his hips were worse. He requested that assistance be given in caring for the decubitus ulcers, all of which had gotten worse after the femur fracture. However, the ulcers on his hips became still worse from April 21 to April 30.
Mr. Wyatt was admitted to Druid City Hospital on May 11, 1981. He had multiple severe decubitus ulcers on the buttocks, *Page 160 
both hips, right lower leg, and abdominal anterior wall. Dr. Herrod noted that the patient suffered from recurring bouts of decubitus ulcers and ordered that the fracture brace be removed in order to have Mr. Wyatt placed in the Hubbard tank for physical therapy treatment of his ulcers.
According to Dr. Herrod, the patient could not tolerate the fracture brace, and upon the request of Dr. Brock, Mr. Mason removed it from the leg on May 14. When the brace was removed, there was no sore or ulcer of any kind on Mr. Wyatt's leg. He was then sent to physical therapy for treatment of the ulcers, and when physical therapist Kathy Hershman saw Mr. Wyatt, he had ulcers on the buttocks, hips, lower right leg and abdomen, but none on his left leg. The patient came to physical therapy without any device on his left leg, but stated that he was wearing splints in his room. Physical therapy treated all of Mr. Wyatt's ulcers during this hospitalization.
Mr. Wyatt did not wear the fracture brace fabricated by Mr. Mason after May 14. After it was removed in the hospital, Dr. Brock applied splints to Mr. Wyatt's left leg. Splints are not as effective as the fracture brace, do not encompass the whole leg, and also open at the knee. The splints were taken off twice a day for treatment in physical therapy and then reapplied. After Mr. Wyatt was discharged and went home, he occasionally removed the splints to sleep.
He next saw Dr. Brock in his office on July 6. Although he seemed to be doing well at that time with his splints, the leg started swelling again, and another splint device was tried.
Another ulcer then developed on the knee above the fracture site, and Mr. Wyatt returned to Dr. Brock on July 28. By then the new decubitus ulcer had opened and it extended into the fracture site on his left leg. Still another splint device was placed on his left leg. When Dr. Brock saw the patient in the Druid City Hospital emergency room on August 1, he had a swollen left knee with bloody drainage coming from an opening of one and a half inches on the left knee. The patient was admitted to the hospital that day.
The doctors found during the August 1 admission that the fracture was firm, although it had healed in poor position. However, Mr. Wyatt had infection from the decubitus ulcer in the fracture site. Dr. Brock found that the problem was not the healing of the fracture, but was infection. The patient had had cellulitis in his knee and accompanying fever since treatment began in April. Dr. Herrod agreed that the infection was serious and stated that the patient had developed some sepsis (infection) and that the slightest amount of pressure could cause an ulcer to develop. There was testimony that infection and subsequent amputation are very common in paraplegics, and the longer one is a paraplegic, the greater are his chances that an amputation will become necessary. Dr. Herrod felt the best treatment to be amputation above the site of infection, and this was carried out on August 13, 1981.
Mr. Wyatt was next admitted to Druid City Hospital on December 30, 1981, again for treatment of severe decubitus ulcers, and was discharged on or about February 8, 1982. When Dr. Brock saw him in his office on March 12, 1982, the patient had a large decubitus ulcer and was continuing to have problems with decubitus ulcers.
Prior to application of the brace, Mr. Mason was told by Dr. Brock that the fracture was in the middle femur or slightly distal, which Mason also described as between the knee and the mid-shaft. Dr. Brock described the fracture as being two to four inches above the knee, in other words, close to the knee and extending up the shaft. The kind of brace which should be applied depends upon the location of the fracture.
The fracture brace covered Mr. Wyatt's entire thigh, because the purpose of a fracture brace is to get as much fixation of the bones as possible. The more tissue contained, the better fixation occurs. In other words, the longer the cuff is, the better the brace is. *Page 161 
Dr. Brock testified that the fracture brace was the best way to exclude the possibility of infection from the patient's multiple decubiti. According to Dr. Brock, a long leg fracture brace, such as Dr. Brock ordered, usually goes from the toes to the trochanter at the top of the hip, and it should be level with the trochanter, in order to get immobilization. He stated that the brace Mr. Mason put on Mr. Wyatt was the type Mr. Wyatt needed to treat this particular fracture, and that it was what he ordered, and what the patient agreed to. He said that the reason for having a long leg brace like the one Mr. Mason applied was to immobilize the whole leg and get firm fixation, that the window in the knee area of the brace makes no difference, and that as long as there is firm fixation, the open knee does not matter.
Dr. Brock approved the brace and testified that Mr. Mason did nothing improper and, further, that Mason met his requirements on application of the brace. It only takes six hours for a decubitus ulcer to develop, he said, and he saw no relationship between the brace and the decubitus ulcer on Mr. Wyatt's knee.
In addition to Dr. Brock, who testified that the brace was what he prescribed, another witness, an orthotist from Birmingham, who was qualified as an expert in the field, testified on behalf of Tuscaloosa Orthopedic. Several lengthy hypothetical questions were posed to him. The hypotheticals were based upon the facts of the case as they had been produced for the jury. The expert stated that, in his opinion and based upon the facts in the hypothetical, there had been no substandard performance in the application of the fracture brace or in the subsequent maintenance of the brace.
The plaintiffs did not offer any expert testimony. In fact, the only complaint they had with regard to ulcers was that because the brace was too long, it caused the ulcer on Mr. Wyatt's abdomen. There was no evidence, expert or otherwise, that connected the brace with the infection which developed at the site of the fracture, necessitating the amputation.
The dispositive issue before us, then, is whether expert testimony is required to establish the proper procedure with regard to the fabrication and application of braces by an orthotist. We hold that expert testimony is required. Although orthotists are not specifically mentioned in the Alabama Medical Liability Act, § 6-5-480, et seq., Ala. Code 1975, they are health care providers who provide services as prescribed by physicians for their patients.
Although this case does not involve a physician, it does involve a claim of negligence in the delivery of health care. Therefore, the usual rules relating to medical malpractice are applicable. In a medical malpractice action, "expert medical testimony is required to establish what is and what is not proper medical treatment and procedure." Gilbert v. Campbell,440 So.2d 1048 (Ala. 1983). An exception to this rule exists "in a case where want of skill or lack of care is so apparent . . . as to be understood by a layman, and requires only common knowledge and experience to understand it." Dimoff v. Maitre,432 So.2d 1225, 1226-1227 (Ala. 1983), quoting Lloyd NolandFoundation, Inc. v. Harris, 295 Ala. 63, 66, 322 So.2d 709, 711
(1975). In the recent decision of Holt v. Godsil, 447 So.2d 191
(Ala. 1984), this Court specifically enumerated the types of medical malpractice cases in which expert testimony is not required. None of these exceptions applies here.
The need for expert testimony does not necessarily depend upon the type of profession which the defendant practices. Rather, it is dependent upon whether the average person is able to decide without expert testimony whether or not the procedure followed in any given case falls below the acceptable standard.
Regardless of education and licensing requirements for orthotists, which Mr. Wyatt emphasizes were rather lax at the time that Mr. Mason was certified, a certain *Page 162 
degree of skill and knowledge is required. It is this specialized training and knowledge that puts an understanding of the acceptable standard of care in orthotics beyond the common knowledge of the jury. Laymen do not have the background and knowledge without expert testimony to understand whether or not a fracture brace has been properly applied.
We hold that absent expert testimony to establish that Mr. Mason's performance fell below the acceptable standard for orthotics, there was no evidence of negligence on the part of the defendant. For this reason, the judgment of the trial court must be reversed.
REVERSED AND REMANDED.
TORBERT, C.J., and MADDOX, FAULKNER, SHORES and BEATTY, JJ., concur.