[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1128 
Rosemont, Inc., a skilled and intermediate care nursing facility, appeals from the judgment of the trial court rendered pursuant to a jury verdict in favor of the plaintiff, William G. Marshall, as executor of the estate of his deceased mother, Emma B. Marshall, in this action to recover damages for her wrongful death. We reverse the judgment of the trial court and remand.
Mrs. Emma Marshall was in her mid seventies. Earlier in life, she had worked as a licensed practical nurse (LPN). She had reared two sons and had been a widow for forty years. Her life, as are so many of even the best and brightest, was an exception to Browning's "geriatric utopia": "Grow old along with me! The best is yet to be, the last of life, for which the first was made."
Although she was relatively healthy, physically, Mrs. Marshall suffered from depression and senile dementia. She took an overdose of nonprescription drugs and was hospitalized. A neuro-psychiatrist recommended that she be placed in the psychiatric unit of a medical center; however, Mrs. Marshall objected, and her regular attending physician recommended that she be placed in a nursing home. The plaintiff visited several nursing homes, including Rosemont. He was assured by the person in charge of administrative affairs at Rosemont that it was the best nursing facility for his mother and that she would receive professional nursing care there.
Mrs. Marshall was admitted to Rosemont, at which time the administrator was aware that she was confused and could not care for herself. The records from Rosemont show that, at the time of her admission, Mrs. Marshall was discontented, depressed, suffering from loss of memory, and that she desired to live at home and had been hospitalized for the preceding twelve days. Hospital records (showing an overdose of medication, depression, senility, and suicidal tendencies, and her physician's notes showing that she was to be observed closely) were attached to Mrs. Marshall's medical history and admission examination materials at Rosemont. During the time Mrs. Marshall was in Rosemont, she occasionally managed to leave the building where she lived;[1] the last time was only a few days prior to the final and fatal occasion. Although Mrs. Marshall was placed in a "posey" vest to prevent her from leaving, she was able to remove this restraint.
Rosemont was a one-story building from which there were five exits. Three of these exits had alarms on them so that when the door was opened from the inside, the alarms would sound. The front exit, and the exit by the south nursing station leading into a parking lot, did not have such alarms. No one was hired with the specific duty of watching these two exits. None of the doors were locked so as to prevent an exit from the building, and there were no fences surrounding the premises.
Mrs. Marshall's attending physician had indicated in his progress notes at Rosemont on April 26, 1982, that Mrs. Marshall needed total 24-hour nursing care. At trial, he *Page 1129 
explained what he meant by 24-hour nursing care:
 "Q. Does that mean someone staying with her all the time or just under supervision?
 "A. She was pretty much a Houdini. She could slip out of the vest restraints literally like a snake. As elderly and apparently weak as she was and they all do this, I'm not making exception to Mrs. Marshall, they can all slide out those restraints like they have been greased. And the only way you are going to keep them from doing it is to have somebody eyeball them twenty-four hours a day. That's what it amounts to."
On July 30, 1982, while a nurse was returning Mrs. Marshall's dinner tray to the dining room, she was left unobserved for approximately five minutes. During that period of time, and although her vest restraint had been in place, Mrs. Marshall managed to leave the building through one of the doors on which there was no alarm. She went across the street, down an embankment, fell and broke her right shoulder. Mrs. Marshall died at Rosemont on August 4, 1982. The forensic pathologist, who performed an autopsy the morning after her death, determined the cause of death to be blood clots in Mrs. Marshall's lungs which had originated from her broken shoulder.
Thereafter, the plaintiff filed a complaint in the Circuit Court of Baldwin County, alleging that Rosemont had negligently and/or wantonly caused or allowed Mrs. Marshall to be injured and that she died as a proximate consequence of her injuries. Rosemont appeals from the trial court's denial of its motion for a directed verdict on the negligence count. The trial court did not submit the wantonness count to the jury; however, the propriety of its determination in this respect is not before us.
Rosemont contends that this is a malpractice case requiring expert testimony. It argues that the plaintiff failed to establish the standard of care applicable to skilled and intermediate nursing care facilities and, therefore, failed to prove a prima facie case of negligence. We agree.
The Alabama Medical Liability Act (§§ 6-5-480 through6-5-488, Code 1975) defines the term "hospital" as "Such institutions as are designated in § 22-21-21 as hospitals." The following is included within the definition of "hospital" in §22-21-20: "Longterm care facilities such as, but not limited to, skilled nursing facilities, intermediate care facilities."
Rosemont is a skilled and intermediate care nursing facility and, therefore, a "hospital" under the Alabama Medical Liability Act.
Section 6-5-484 (a), Code 1975, in pertinent part, reads:
 "In the case of a hospital rendering services to a patient, the hospital must use that degree of care, skill and diligence used by hospitals generally in the community."
A hospital is not an insurer of the successful issue of treatment or service to a patient. § 6-5-484 (b), Code 1975.
Mrs. Marshall was a "patient" and Rosemont is a "hospital" within the meaning of § 6-5-484, supra. Therefore, the plaintiff can prevail only if he established at trial that Rosemont, in rendering or failing to render services to his mother, did not use that degree of care, skill and diligence used by skilled and intermediate care nursing facilities generally in the community.
To establish a hospital's negligence under the Alabama Medical Liability Act, ordinarily, the plaintiff must offer expert medical testimony as to what is or what is not the proper practice, treatment, and procedure. In such a case, the lack of expert medical testimony results in a lack of proof which is essential to establish a plaintiff's case. Parrish v.Spink, 284 Ala. 263, 224 So.2d 621 (1969); TuscaloosaOrthopedic Appliance Co. v. Wyatt, 460 So.2d 156 (Ala. 1984).
An exception to the foregoing general rule has been recognized where the want of skill or lack of care is so apparent as to be within the comprehension of the *Page 1130 
average layman and thus requires only common knowledge and experience to understand it. Parrish v. Spink, supra;Tuscaloosa Orthopedic Appliance Co. v. Wyatt, supra. This exception has usually been applied under circumstances where the doctrine of res ipsa loquitur is applicable. (See Holt v.Godsil, 447 So.2d 191 (Ala. 1984), wherein the Court recognized that the exception applies where a foreign instrumentality is found in the plaintiff's body following surgery, citing Sellersv. Noah, 209 Ala. 103, 95 So. 167 (1923), and where the injury complained of is in no way connected to the condition for which the plaintiff sought treatment, citing Parrish v. Spink, supra.
Another exception has been recognized where the plaintiff introduces a recognized standard or authoritative medical text or treatise to prove what is or is not proper practice, Holt v.Godsil, supra, citing Zills v. Brown, 382 So.2d 528 (Ala. 1980).[2]
Neither of these exceptions is applicable in the present case. Our review of the record indicates that the plaintiff failed to establish, by expert testimony, what degree of care, skill, and diligence is used by skilled and intermediate care nursing facilities generally in the community in rendering treatment and services to a patient such as Mrs. Marshall. Therefore, the jury was without a standard against which to evaluate Rosemont's practices and procedures. In our view, the degree of care, skill, and diligence which should have been exercised by Rosemont in caring for a patient such as Mrs. Marshall, is not so apparent as to be within the comprehension of the average layman, requiring only a common knowledge and understanding.
Mrs. Marshall's family and attending physician sought to confine her to Rosemont for the purpose of treating her deteriorating mental and physical conditions. Obviously, the medication and restraints prescribed by her physician, and the measures undertaken by the officials and staff at Rosemont, in the end, were not successful in so confining her. The mere fact that these efforts were not successful does not permit a finding of negligence by the jury on the part of Rosemont. §6-5-484 (b), Code 1975, supra; Berry v. Robertson, 285 Ala. 623, 235 So.2d 657 (1970). Intermediate nursing care facilities, such as Rosemont, are not prisons or asylums. They exist primarily for those who are not only aged and mentally or physically incapacitated, but also for those who, by reason of having no immediate family capable of providing assistance, require additional care. It is, therefore, incumbent upon such facilities not only to care for their patients in the medical sense, but to provide some atmosphere of homelife for them also.
The plaintiff contends that Rosemont was negligent in its failure to station guards at, or install alarms on, all of the exits, and to give notice to the plaintiff of his mother's wandering propensities. Rosemont accepted Mrs. Marshall as a patient knowing that she was to be observed closely. It retained her as a patient knowing that she needed total 24-hour nursing care. There was no evidence by expert testimony, or authoritative text or treatise, as to the standard of care applicable to intermediate nursing care facilities such as Rosemont. Such a standard, by necessity, would be influenced by a number of considerations, inter alia, the applicable state and federal regulations governing such facilities, physician-imposed restrictions, and policy determinations within the industry. Accordingly, there is insufficient evidence in this case for the jury to conclude that Rosemont was understaffed, provided inadequate supervision, or misapplied the medication or restraint prescriptions of Mrs. Marshall's attending physician. There was *Page 1131 
also insufficient evidence for the jury to conclude that Rosemont was unique within the industry in not utilizing guards or alarms in the manner contended or in failing to closely observe Mrs. Marshall or failing to give her 24-hour nursing care. Concerning the issue of notification, the record does show that Dr. Rockwell, Mrs. Marshall's attending physician, testified, in pertinent part, as follows:
 "Q. My question is going to be to you, Doctor Rockwell, do you feel like both based on your qualifications and your treating these folks all of these years.
 "Do you feel like someone from the rest home should have told this man sitting here that his mother had gotten out like this?
 "A. I would think so. I am pretty sure that he was aware of it.
"Q. You are pretty sure that he is aware of it?
"A. I couldn't swear that he was.
 "Q. Of course, if it was your mother, you would certainly expect for the people to let you know that; wouldn't you?
"A. (Nods head affirmatively.)"
Mrs. Sandra Oldham, the director of nursing at Rosemont during the period of Mrs. Marshall's stay, also testified, in pertinent part, as follows:
 "Q. Do you feel like the Rosemont Nursing Home had an obligation to let these people know that his mama was getting out of the nursing home?
"A. Yes, sir, I do."
We consider this testimony insufficient to establish negligence on the part of Rosemont, because the degree of care required of that facility, in this respect, is not that which persons of ordinary prudence would exercise under like conditions, but that which is ordinarily exercised by similar institutions and facilities under like conditions.
Because of the plaintiff's failure to establish, by expert testimony, the standard of care applicable to Rosemont, we hold that the plaintiff did not make out a prima facie case of negligence and, consequently, the trial court erred in notdirecting a verdict in favor of Rosemont.
The resolution of the foregoing issue precludes the necessity of our addressing the issue of proximate causation, which was also raised by Rosemont on appeal.
The judgment of the trial court is reversed and the cause is remanded.
REVERSED AND REMANDED.
TORBERT, C.J., and ALMON, SHORES, BEATTY and ADAMS, JJ., concur.
MADDOX, J., concurs specially.
JONES and FAULKNER, JJ., dissent.
[1] The evidence was disputed as to whether Rosemont had notified the plaintiff on these occasions.
[2] In Holt v. Godsil, supra, the Court also recognized an "exception" to the general rule where the plaintiff is himself or herself a medical expert qualified to evaluate the applicable standard of care, and degree of skill utilized. This, of course, is not actually an exception to the general rule requiring expert medical testimony, but merely a recognition that, under certain circumstances, the allegedly negligent conduct may be evaluated by the plaintiff. See alsoLamont v. Brookwood Health Services, 446 So.2d 1018 (Ala. 1983).