512 So.2d 58 (1987)
Maurine WILLIAMS
v.
Ralph R. ROBINSON.
85-1055.
Supreme Court of Alabama.
May 29, 1987.
Rehearing Denied July 24, 1987.
J. Allen Brinkley of Brinkley & Ford, Huntsville, for appellant.
William T. Mills II of Porterfield, Scholl, Bainbridge, Mims & Harper, Birmingham, for appellee.
BEATTY, Justice.
A summary judgment was granted to Dr. Ralph R. Robinson in a medical malpractice action filed against him by Maurine Williams. That judgment was made final pursuant to Rule 54(b), A.R.Civ.P., and Ms. Williams appeals.
On December 10, 1982, Ms. Williams was admitted to the Summit Medical Center ("Summit") to have an abortion performed. Dr. Robinson performed an operation intended to terminate Ms. Williams's pregnancy by using a vacuum, or suction, procedure. After the procedure was completed, Ms. Williams was taken to a "recovery room." There, a nurse gave her either a prescription or actual antibiotic tablets (the testimony is unclear as to which) and also gave her instructions that she not take "sit-down baths" or engage in sexual intercourse at any time during the next three weeks. She was also told that she was to return for a "follow-up" visit in three weeks.
The next morning, Ms. Williams, who had had a successful abortion on a previous occasion, began noticing that she felt different this time than she had after the earlier abortion procedure. She was still having morning sickness. She was also *59 experiencing cramping and "spotting." Based upon her earlier experience, Ms. Williams believed she should have been experiencing heavier bleeding. When these symptoms had not dissipated by December 14, she decided to seek help. She dialed a toll-free telephone number which had been given to her before she left Summit. A woman answered the telephone, and Ms. Williams asked her if she could speak with a nurse. The woman informed her that a nurse was not available, but asked if she could help. Ms. Williams described her symptoms and explained that she still felt as if she were pregnant. The woman replied that the cramping and spotting were normal and that, as far as the morning sickness was concerned, it was simply a "neurotic reaction" to the procedure that had been performed. The symptoms, however, continued.
On December 18, at about 1:00 p.m., Ms. Williams again called the number she had been given before she left Summit. Again, the person answering the telephone informed her that a nurse was not available to talk to her. However, this time Ms. Williams insisted, and another person was called to the telephone. She explained to that person that she was still having cramping and morning sickness. Further, she told the person that the bleeding had totally ceased. The person informed her, as she had been informed the first time, that these symptoms were not abnormal.
After the telephone call, Ms. Williams rested in bed until about 4:00 p.m., when she began experiencing sharp pains in her stomach. She got up and tried to get to the bathroom, but fainted. When she regained consciousness, she felt very cold, and, yet, her hands were sweaty. She attempted to get help, but fainted again as she opened her door. A neighbor saw her and came to her aid. An ambulance was called, and Ms. Williams was taken to a Huntsville hospital. Once there, she underwent emergency, lifesaving, exploratory surgery which revealed a pregnancy in one of Ms. Williams's fallopian tubes.
On January 27, 1984, Ms. Williams filed suit against both Dr. Robinson and Summit, alleging that they had negligently performed the abortion, had negligently failed to advise Ms. Williams of the risk of the abortion procedure, had negligently failed to provide post-operative care, had negligently failed to utilize that degree of skill and care required of such hospitals and physicians, had negligently failed to inform her of the dangers of an ectopic pregnancy, and, finally, had negligently failed to diagnose an ectopic pregnancy.
Dr. Robinson filed an answer denying these allegations. Subsequently, after discovery was completed, he moved for summary judgment, arguing that Ms. Williams had "failed to produce even a scintilla of evidence that this defendant violated any standard of care which proximately caused the Plaintiff's injuries."
The trial court, while discussing only two issues, rendered judgment in favor of Dr. Robinson. These issues concerned (1) the failure of Dr. Robinson to diagnose the ectopic pregnancy and (2) his failure to provide adequate follow-up care. In rendering judgment for Dr. Robinson, the trial court expressly, and inexplicably, discounted the testimony of the plaintiff's medical expert, Dr. Josefino C. Aguilar, which was to the effect that Dr. Robinson had, indeed, violated the appropriate standard of care both in failing to diagnose the ectopic pregnancy and in failing to provide proper follow-up care. Specifically, it determined the following to be true, even though Dr. Aguilar testified to the contrary:
(1) That the presence of chorionic villi in the substance taken from the uterus always means that there was an intrauterine pregnancy, and
(2) That there is no evidence that Dr. Robinson breached the appropriate standard of care.
Our standard for reviewing a summary judgment is the same standard as that used by the trial court in ruling on motions for summary judgment. Long v. Bankers Life & Casualty Co., 294 Ala. 67, 311 So.2d 328 (1975). When a summary judgment has been granted for a defendant on the ground that the plaintiff has failed to prove a cause of action, we look to see if there is *60 any evidence which would be legally admissible at trial as to every essential element of the cause of action. Welch v. Houston County Hospital Ass'n, 502 So.2d 340 (Ala.1987); Harrell v. Reynolds Metals Co., 495 So.2d 1381 (Ala.1986). In determining whether there is any evidence of every element of a cause of action, we must review the record in the light most favorable to the plaintiff and resolve all reasonable doubts against the defendant. Autrey v. Blue Cross & Blue Shield of Ala., 481 So.2d 345 (Ala. 1985). There must be no genuine issue of material fact, and the moving party must be entitled to judgment as a matter of law. Silk v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 437 So.2d 112 (Ala.1983). The trial court is not permitted to resolve any factual issue; such resolution is for the jury. Ingram v. Akwell Industries, Inc., 406 So.2d 897 (Ala. 1981).
Our review of the record indicates that the trial court has either erroneously failed to consider certain evidence in reaching its conclusion or has erroneously made findings of fact on these controverted issues. We take this occasion to point out only a few of the pertinent portions of the record.
The following is an excerpt from the affidavit of Dr. Aguilar, which was submitted in support of Ms. Williams's first response to the defendant's motion for summary judgment. We quote the substance of this affidavit in full:
"My name is Josefino C. Aguilar and I am a board certified forensic pathologist and general medical practitioner in Huntsville, Madison County, Alabama, and have been so for many years.
"I have examined the medical records from the Summit Medical Center and the Huntsville Hospital, including the histopathologic reports from the Biomedical Reference Laboratories, Inc., from Birmingham, Alabama, and Dr. C.L. Butler of Huntsville Hospital, Department of Pathology, of Huntsville, Alabama, which yielded the following facts:
"The surgeon, Dr. Ralph Robinson, who performed the abortion by suction on the 10th day of December, 1982, ... entered his findings in the operative procedure ... that the product of conception was normal and the fetal age was six (6) weeks.

"The histopathologic report from the Biomedical Reference Laboratories, Inc., which showed compact and spongy decidual endometrium and chorionic villi only as reported on the 14th of December, clearly conflicts with Dr. Robinson's operative report.

"The patient, based on the record, ruptured the left fallopian tube sometime before 6:26 P.M. on the 18th day of December, eight (8) days after the operation and at least four (4) days after she called the Summit Medical Center complaining of severe cramping (Martin, R.N., Nurses Post-Tab problem Sheet 12-22-82).
"When seen at the emergency room of Huntsville Hospital on the 18th day of December, the patient was in pain and agony which necessitated a life saving emergency surgery.
"Finally, Dr. Moses Awoniyi, surgeon, operative report, and Dr. C.L. Butler, pathologist, histopathologic reports confirm the existence of an ectopic pregnancy which had ruptured.
". . . .

"In my opinion, the medical and surgical problems which Miss Maurine Williams suffered were the direct result of Dr. Ralph Robinson's and Summit Medical Center's failure to provide adequate medical and surgical care. They did not follow-up on the histopathologic report submitted by the reference laboratory (Biomedical Reference Laboratories, Inc.) of their choice. No medical (physician) provision was made to have the patient examined after Miss Maurine Williams made her medical problem known." (Emphasis added.)
In the plaintiff's second response to the defendant's motion for summary judgment, she specifically referred the court's attention to, among other things, portions of Dr. Aguilar's deposition. We quote the pertinent portions:

*61 "To begin with, if I was the doctor or I was the institution having seen this kind of report, it would tell me one thing. Number one, the abortion was not complete. If indeed there was chorionic villi present and I'm beginning to doubt thatif indeed there was chorionic villi present in the specimen which I doubt as the majority of the specimen is nothing but decidual tissue, I would start thinking about something was left behind. Because this was a vacuum type abortion. See a vacuum type abortion is you suck the whole thing out into a bag and the specimenall the specimen will land into this particular bag in the suction apparatus. You send that whole thing out to be checked out and verified by a pathologist to see if there is any defect or if everything was out. The fact of the matter is, the only thing I have here againmost of the specimen that I'm sure of that was present were decidual tissue and there was a mention of a chorionic villi without describing what the chorionic villi looked like." (Emphasis added.)
He later contrasted the findings in this report with those made in a report following the emergency follow-up procedures:
"Going now to December 21, 1982, report we are talking about here a product of conception or essentially a product of a ruptured ectopic pregnancy. It tells you exactly what is in the specimen. The whole specimen was submitted. That is, in the the microscopic clearly [sic] stated `fetal tissue fairly well preserved and shows early stages of development with some primitive structures recognizable. The placental tissue has young but well developed villi. The solid fragments of tissue appear to be a portion of a tube with one section showing a small tube lumen with surrounding muscularis. Other portions show a superficial decidual area with areas of hemorrhage and some attached placental villi.'
"By comparison, the second report in reference to the first report, actually tells you what you are looking for as a physician. Everything that you want to know about your case. The product of conception, the piecesince this was from a ruptured ectopic pregnancy of the left tube, it tells you that you also submitted a piece of fallopian tube with the specimen." (Emphasis added.)
Finally, in her third response to the defendant's motion for summary judgment, another affidavit of Dr. Aguilar is attached. This includes the following:
"The purpose of an abortion is to terminate pregnancy. A doctor who undertakes to perform an abortion has undertaken to terminate the pregnancy of the patient and this was never done in this particular instance. It is elementary that his job was to end the pregnancy and this he did not do.
". . .
"... It is my professional opinion as a medical doctor licensed to practice in the State of Alabama that Dr. Robinson did not comply with his duty to terminate or end the pregnancy. Dr. Robinson, who did the procedure and who was the medical director of the clinic, did not do what he undertook to do. He violated the standard of care required of doctors doing such procedures when he relied solely on the existence of chorionic villi to exclude the possibility of an ectopic pregnancy. Chorionic villi comes from the fertilized egg, not the lining of the uterus or tube.
". . .
"Dr. Robinson failed to diagnose the nature of the pregnancy before and after the suction procedure was performed. He did not exercise enough diagnostic care and did not exercise sufficient due care in regard to diagnosing the nature of the pregnancy in the patient. He apparently never examined the lady at all and was with her only five or ten minutes. (See deposition of Dr. Robinson, Pages 16 and 14.) Generally, where there is a six weeks tubal pregnancy, you will notice a lump on one side of the lady's abdomen. Thereafter you can go forward either by ultra-sound or culposcopy method for confirmation. Furthermore, where you *62 have a suction machine, an abortion machine, you have a bag where all the contents or tissue lands. It doesn't make sense and is inconsistent with medical knowledge that only chorionic villi was found when the fetus was six weeks of age. A fetus six weeks of age is not microscopic and can be seen with a naked eye. Failure to refer to the fetus should have been a red flag to Dr. Robinson. He never read the pathological report until it was too late. (See Deposition of Dr. Robinson, Pages 116 and 117.) If he wasn't supposed to read the path report, why was it sent to him? It was a violation of a standard of care not to read the path report. Every doctor knows you are supposed to read the path report. I have read Dr. Robinson's deposition and it is apparent that he never examined the lady and that he never did any type of follow-up on her. (See Deposition of Dr. Robinson, pages 45 and 46.) All he did was take a suction machine and around five minutes later walked away from the problem and left the problem to the ladies.
"There was no disclaimer by him that he would not be responsible for the follow-up or any falure to diagnose or any failure to terminate the pregnancy. As the physician in charge of this patient it was his responsibility to see that the pregnancy was properly terminated. It was not the sole responsibility of Diane Derzis, the administrator of the Summit Medical Center, Inc., who had no nursing training and no medical training other than attending a few seminars. (See Deposition of Diane Derzis, page 25.) Or some lady who was answering the phone. It was his responsibility as the Medical Director and the physician of this very patient.

"In regard to the follow-up care, it is apparent that Maurine Williams had an ectopic tubal pregnancy which ruptured days after Dr. Robinson and Summit Medical Center, Inc., were employed to terminate her pregnancy.

". . .
"Furthermore, the deposition of Diane Derzis lists the number that was given the patient, as a toll free number, specifically, 1-800-292-4904, therefore, it doesn't make sense that Dr. Robinson could reasonably contend that Maurine Williams did not try to call him. Obviously, she called the phone number that they gave her. He [was familiar with] the forms being distributed to his patient, the forms and procedures given to his patient before he attempted the abortion, and the certain number to call. If he knew this was the phone number and the procedure that his patients were to use, then he should be responsible for those he left with that responsibility of answering the phone....
"... As previously stated, this doctor undertook to end her pregnancy. ... A professional who assumes this responsibility is under a duty to do it right. If he permits a phone answering lady to screen his calls, that lady is his responsibility. If she gives the wrong medical advice, it is his responsibility.
"During the process of evacuation by the suction, portions of the normal developing chorionic villi (placenta) could have been sucked out and then submitted to the pathologist. There was no mention of a fetus or embryo in the pathologic report from Summit Medical Center, Inc., referral lab. Dr. Robinson and Summit Medical Center did not do what they undertook to do. Maurine Williams, after the alleged[ly] completed suction abortion, continued to have symptoms described as persisted pregnancy and as a tubal pregnancy. Dr. Robinson's and Summit's failure to completely diagnose her even in the follow-up was a violation of the standard of care by both.

"... Contrary to what Dr. Robinson says, the fetus was not microscopic. The doctor further violated the standard of care and is absolutely incorrect when he stated that the fetus was six weeks of age and then states in his deposition that the fetus was microscopic. (See Deposition of Dr. Robinson, pages 37 and 115.) It is generally accepted in all the texts that six weeks of *63 age is not microscopic, but is rather between 22 and 24 mm in size. His operative notes are attached to this affidavit as Exhibit 2 and are set out in pertinent part below:
"`The products of conception appeared normal and the fetal age was six (6) weeks. The patient was sent to the recovery room in good condition.'
"See page 171 of Williams Obstetrics, 16th Edition, which is attached hereto as Exhibit 4, in which it is stated that a 6 week old fetus is 22 to 24 millimeters in length. I have drawn this length on that page to emphasize to the reader the size of this thing. The point is that no pathologist would have missed it had in fact a 6 week old fetus been in the bag of tissue to be analyzed. The vacuum machine empties all contents of the patient's pregnancy into a bag which is then sealed and sent to the pathologist. If the pathologist misses a microscopic fetus in this first test he strains the bag's contents to find it. You don't just fail to put down a reference to a fetus if it is in there. See Exhibit 3 which is the path report that does not refer to a fetus. My opinion is that in this case, Dr. Robinson didn't get it when he used his vacuum machine.
". . .
"... The Chorionic Villi Found Does Not Exclude an Ectopic Pregnancy. Dr. Robinson contends in his deposition that chorionic villi means placenta and placenta means a pregnancy inside the uterus only. This is absolutely not correct. The actual records in this case rebut this contention.

". . .
"There [have] been furnished to me four pieces of medical literature which have been proposed for the proposition that when you find chorionic villi you always have an intrauterine pregnancy. This assumption is absolutely wrong. The articles produced are only a part of the knowledge on the subject. Even at that, they do not stand for that proposition. At Exhibit 7, entitled Gynecologic & Obstetric Pathology, at pages 480 and 481, it is said that, `If definite decidual tissue is obtained at curettage, and if it be not accompanied by chorionic villi, one is justified in thinking of the "probability" of extrauterine pregnancy.' Here the article itself uses the word `probability' which obviously implies that it is not true in all cases.
"For example, see Exhibit 8, Williams & Eastman on Obstetrics, which shows a cross section of a fallopian tube and refers to chorionic villi. See also Exhibit 9 from the same book showing a microscopic picture of chorion in the fallopian tube. See also Exhibit 10 which is another picture of chorion in the tube in an ectopic pregnancy. This was taken from Novak's Textbook of Gynecology, 10th edition (1981).
"Now, saying all of the above, it is my opinion that there were not two pregnancies here, but rather one single ectopic pregnancy near the `corner' of the fallopian tube and uterus....
"All of the above texts which have been referred to are accepted medical texts and ... are used routinely by physicians in the field." (Emphasis added.)
Should the plaintiff have produced anything more in order to satisfy the requirements of the scintilla rule? Clearly, there is at least a scintilla of evidence as to each element of Ms. Williams's negligence cause of action. Genuine issues of material fact exist.
The foregoing considered, the judgment of the trial court is reversed, and this cause is remanded for further proceedings.
REVERSED AND REMANDED.
MADDOX, JONES, ALMON and SHORES, JJ., concur.
TORBERT, C.J., and HOUSTON and STEAGALL, JJ., dissent.
ADAMS, J., not sitting.
HOUSTON, Justice (dissenting).
Ms. Williams was pregnant. She contacted Summit Medical Center and made an appointment to have her pregnancy aborted. The year before the medical procedure *64 made the basis of this suit, Ms. Williams had had an abortion at another clinic without complications. She attended a counseling session at Summit and reviewed forms, including a form entitled "Consent to Abortion," which contained the following:
`I understand that having an abortion involves some risks to me, including the following: ... Ectopic pregnancy or pregnancy in the tubes (I understand that in approximately 2% of all pregnancies the pregnancy can be in the fallopian tubes leading to the uterus and an abortion procedure will not successfully terminate such a pregnancy, and that due to the threat of rupture of the fallopian tubes, immediate hospitalization may be necessary); and Incomplete abortion (in some instances all tissue may not be removed and incomplete abortion will result). I understand that the doctor and the clinic make no guarantee regarding the abortion.... If the abortion is incomplete I understand that the procedure may have to be repeated or I may still be pregnant." (Emphasis added.)
In her deposition Ms. Williams testified that she recalled being told of the risks associated with the procedure. She signed and acknowledged receipt of the "Consent to Abortion" form.
Dr. Robinson is a diplomate of the American Board of Obstetrics and Gynecology. At the time the procedure in question was performed on Ms. Williams, he had practiced obstetrics and gynecology for over thirty years and had performed numerous abortions. Dr. Robinson was not an employee of Summit, but an independent contractor.
On December 10, 1982, Dr. Robinson performed a hands-on examination of Ms. Williams and then used a suction device designed to effect the abortion. He examined the substance removed from Ms. Williams and determined that it was the product of conception and represented an intrauterine pregnancy which had been aborted. Subsequently this substance was microscopically examined by a pathologist, whose report showed that it contained fragments of decidual (lining of the uterus wall) and chorionic villi (placenta), which substantiated Dr. Robinson's conclusion that a product of conception had been removed from Ms. Williams.
Ms. Williams was given both verbal and written instructions and an appointment three and a half weeks later at Summit. The appointment was not with Dr. Robinson. Ms. Williams called Summit twice after the procedure, complaining of "feeling pregnant," morning sickness, lack of bleeding, and stomach pains. She never talked with Dr. Robinson, nor did she ask to speak with him. There is no evidence that Summit ever notified Dr. Robinson of her calls.
On December 18, 1982, several hours after Ms. William's second call to Summit, she was taken to a hospital for emergency exploratory surgery. The surgery was performed by Dr. Moses Awoniyi, a board eligible obstetrician and gynecologist. He discovered that Ms. Williams had an ectopic pregnancy (i.e., a pregnancy in the fallopian tube outside the uterine cavity) and aborted it. The fetus removed from the fallopian tube by Dr. Awoniyi showed no signs of necrosis or damage.
The evidence showed that the odds of having an intrauterine and ectopic pregnancy at the same time are 30,000 to 1 and that a physician would not have looked for an ectopic pregnancy after diagnosing an intrauterine pregnancy. This is not contradicted by expert medical testimony.
The majority correctly sets out our standard of review in this case. This being a medical malpractice action, it was encumbent upon Ms. Williams to establish by expert testimony the appropriate standard of care and a breach thereof by Dr. Robinson. Gilbert v. Campbell, 440 So.2d 1048 (Ala.1983); Rosemont, Inc. v. Marshall, 481 So.2d 1126 (Ala.1985). This she did not do. There is no evidence that Dr. Robinson failed to advise Ms. Williams of the risks associated with the abortion procedure. In fact, the evidence is clearly to the contrary. Furthermore, there is no evidence that Dr. Robinson was negligent in failing to provide post-operative care. All of Ms. Williams's communications were with Summit. *65 Dr. Robinson was never notified of Ms. Williams's telephone calls.
The majority relies on the deposition and affidavit testimony of Dr. Josefino Aguilar, a board certified forensic pathologist and general medical practitioner, to find evidence of Dr. Robinson's negligence in performing the procedure in question. The thrust of Dr. Aguilar's testimony is that "it is more probable that [Ms. Williams had] a single tubal ectopic pregnancy near the corner of the uterus instead of [a] dual pregnancy." He bases this conclusion on the following:
1) the pathologist's report on the substance removed from Ms. Williams's uterus. Dr. Aguilar testified that in his opinion the report was not thorough enough (while Dr. Aguilar admitted that the report stated that a product of conception (chorionic villi) had been removed, because the product of conception was not specifically described and there was no mention of a fetus, he speculated that a product of conception may not have been present in the sample examined);
2) conceding the presence of a product of conception in the substance removed from Ms. Williams, the possibility that it was actually removed from the fallopian tube (instead of the uterus) by the suction device used by Dr. Robinson; and,
3) the fact that dual pregnancies are rare (the odds against one are 30,000 to 1).
An expert witness may give opinion testimony based upon either facts of which he has personal knowledge or facts which are assumed in a hypothetical question. In either event, our cases are clear that the facts known to the expert or hypothesized must be facts in evidence. Romine v. Medicenters of America, Inc., 476 So.2d 51 (Ala.1985). Dr. Aguilar's opinion testimony in this case is not based on the undisputed facts which are in evidence. The pathologist's report verified Dr. Robinson's testimony that a product of conception had been removed from Ms. Williams. It was also established that the fetus removed from Ms. Williams's fallopian tube during the December 18 emergency surgery showed no signs of necrosis or damage. Necrosis or damage would have occurred within approximately three hours of the December 10 procedure performed by Dr. Robinson had the suction device used in that procedure removed a product of conception from the fallopian tube. Therefore, Dr. Aguilar's opinion that a product of conception may not have been removed by Dr. Robinson, or that if it had been it was removed from the fallopian tube, is simply not based on the undisputed facts in evidence. The undisputed facts in this case show that chorionic villi are a product of conception and that chorionic villi were removed from Ms. Williams's uterus, not her fallopian tube. Ms. Williams could not have had chorionic villi in her uterus without having a pregnancy there. I agree with the trial court's observation that "the failure of the pathologist to make a statement concerning fetal material or an embryo does not of itself raise suspicion or negate the conclusion that [Ms.] Williams did have an intrauterine pregnancy." Furthermore, the rarity of a dual pregnancy does not in and of itself provide an adequate foundation for Dr. Aguilar's opinion that such a pregnancy did not exist in this case.
There was no legally admissible evidence introduced by Ms. Williams to show that she did not have an intrauterine pregnancy which was aborted by Dr. Robinson. Given this, there is no evidence that Dr. Robinson breached the appropriate standard of care. A physician would not have looked for an ectopic pregnancy after diagnosing an intrauterine pregnancy.
In my special concurrence in Creel v. Brown, 508 So.2d 684 (Ala.1987), I posed the question of whether a witness's isolated answer to a particular question, removed from the totality of the testimony of that witness which explains or qualifies that answer, satisfies our scintilla-of-evidence sufficiency standard. I remain convinced that it does not. Likewise, I do not believe that a witness's isolated statement removed from the foundation on which that isolated statement is predicated, satisfies our scintilla-of-evidence sufficiency standard. I believe that we must review all of the testimony of a particular witness and *66 review it in the light of all other evidence to determine whether that witness has provided any evidence to take a plaintiff's case to the jury. In this case, if I consider only certain of Dr. Aguilar's opinions expressed in his affidavit, I could logically infer that Dr. Robinson was negligent in his treatment of Ms. Williams. However, if I consider all of Dr. Aguilar's testimony and all other legal evidence introduced, on which Dr. Aguilar's opinion must be based, any gleam, glimmer, spark, or trace of evidence that Dr. Robinson deviated from the appropriate standard of medical care in treating Ms. Williams disappears. Therefore, I must respectfully dissent.
TORBERT, C.J., and STEAGALL, J., concur.