On July 27, 1981, Sandra McGee gave birth by cesarean section to a son, Bentley, who suffers from cerebral palsy. Thereafter, Bentley's parents, Mark and Sandra McGee, brought suit on his behalf against Dr. Charles Bradford, who performed the cesarean section, and Jackson County Hospital, alleging that they negligently departed from the appropriate standard of care and thereby proximately caused Bentley's *Page 1078 
injuries. At trial, a jury heard testimony from several witnesses, including Dr. Bradford and four experts, and returned a verdict for the McGees, awarding them $950,000 in compensatory damages. Dr. Bradford and Jackson County Hospital moved for J.N.O.V. or, in the alternative, for a new trial. The trial court granted the hospital's J.N.O.V. motion, and Dr. Bradford's new trial motion, but denied Dr. Bradford's J.N.O.V. Dr. Bradford appeals from the denial of his J.N.O.V. motion, and the McGees cross-appeal from the granting of the new trial motion.[1] For the reasons discussed below, we affirm the rulings on both motions and remand this cause for a new trial as to the claims against Dr. Bradford.
 I. New Trial
After hearing testimony from several jurors, the trial court granted Bradford's motion for new trial on the following grounds:
 "1. [P]robable prejudice to the defendant caused by jurors making inaccurate answers to questions propounded on voir dire examination.
 "2. [P]robable prejudice to the defendant caused by jurors failing to respond to questions propounded on voir dire examination.
 "3. [P]rejudice [to] the defendant [due to the court's] failing to sustain timely objection to improper remarks of counsel in closing argument and in failing to give curative instructions."
The trial court considered several instances of jurors' incomplete responses to voir dire questions and one instance of improper remarks during closing as grounds for granting a new trial; we find that at least two of these grounds — namely, Mr. David Woodall's and Mrs. Francis Little's failure to respond to material questions on voir dire — clearly support the trial court's finding of probable prejudice; and, therefore, we affirm.
During voir dire, Bradford's counsel asked the jury venire, including Mr. David Woodall, who became a juror in the case, whether any of them knew members of the Potter or McGee families. (Sandra McGee's maiden name was Potter.) No prospective juror responded to this question. During the hearing to consider the motion for new trial, Mr. Woodall testified that his sister, Alice Potter, is the aunt of Sandra McGee by marriage. He testified that Mrs. Potter had visited the trial at least twice and had had contact with him and his wife one night during the trial. Throughout the trial, Bradford's counsel was not aware of juror Woodall's relationship with Sandra McGee.
Bradford's counsel also asked the jury venire whether any of them had a family member who suffered from a disability. Francis Little, who became a juror, did not respond to this question. During the post-trial hearing, however, Mrs. Little testified that her son had been seriously injured in an automobile accident and had suffered brain damage. Her son had been convalescing at her home prior to the trial. During the trial, she had in her possession photographs of her son's accident; and, on one occasion, she approached plaintiff's counsel to discuss the possibility of filing suit against the driver who had hit her son. Plaintiff's counsel refused to discuss this matter with her during the trial. After the jury returned a verdict, she approached plaintiff's counsel again and asked him to represent her son.
The trial court was in the best possible position to determine whether there was probable prejudice. These two instances of non-responsiveness on the part of jurors when asked extremely material questions during voir dire constitute a sufficient basis upon which the trial court could have found probable prejudice. Therefore, we hold that the trial court did not abuse its discretion in granting a new trial. Gold Kist, Inc. v. Brown, 495 So.2d 540
(Ala. 1986); Ensor v. Wilson, 519 So.2d 1244 *Page 1079 
(Ala. 1988) (Houston, J., concurring specially).
 II. J.N.O.V.
Whether the trial court properly denied Dr. Bradford's J.N.O.V. motion turns on whether the McGees satisfied their burden of producing sufficient evidence setting forth the appropriate standard of care, Dr. Bradford's breach of that standard, and a proximate causal connection between Dr. Bradford's breach and Bentley's injuries. After a careful and complete review of the evidence, using the scintilla rule of evidence, we find that the McGees satisfied their burden of proof. Accordingly, we affirm the trial court's judgment denying the J.N.O.V.
Before examining the record, we delineate the standard of review and the law governing actions brought under the Medical Liability Act.
This action was pending in the courts of this state prior to June 11, 1987; therefore § 12-21-12, Code of Alabama 1975, as amended, does not apply; and the applicable standard of review is as follows:
 " 'A motion for directed verdict or J.N.O.V. is tested against the scintilla rule, which requires that a question go to the jury "if the evidence or any reasonable inference arising therefrom, furnishes [so much as] a mere gleam, glimmer, spark, the least particle, the smallest trace, or a scintilla in support of the theory of the complaint." Alabama Power Co. v. Taylor, 293 Ala. 484, 306 So.2d 236 (1975). In reviewing a trial court's ruling on these motions, the appellate court, guided by the standard of the scintilla rule, determines whether there was sufficient evidence below to produce a conflict warranting jury consideration. Baker v. Chastain, 389 So.2d 932 (Ala. 1980). Like the trial court, the appellate court must view all the evidence in a light most favorable to the non-moving party. Ritch v. Waldrop, 428 So.2d 1 (Ala. 1982).' "
Peete v. Blackwell, 504 So.2d 222, 224 (Ala. 1986) (quoting Hammond v. City of Gadsden, 493 So.2d 1374,1376 (Ala. 1986)).
Section 6-5-484, Code of Alabama (1975), as we have construed it, imposes a legal duty upon doctors to exercise the degree of reasonable care, diligence, and skill that reasonably competent physicians in the national medical community would ordinarily exercise when acting in the same or similar circumstances. Keebler v. Winfield CarrawayHospital, 531 So.2d 841 (Ala. 1988). To recover damages for an alleged breach of this duty, a plaintiff must produce evidence that establishes 1) the appropriate standard of care, Keebler, supra; Dobbs v. Smith,514 So.2d 871 (Ala. 1987), 2) the doctor's deviation from that standard, Keebler; Dobbs, and 3) a proximate causal connection between the doctor's act or omission constituting the breach and the injury sustained by the plaintiff.Ensor v. Wilson, 519 So.2d 1244 (Ala. 1987);Howard v. Mitchell, 492 So.2d 1018 (Ala. 1986). To present a jury question, the plaintiff must adduce some evidence indicating that the alleged negligence (the breach of the appropriate standard of care) probably caused the injury. A mere possibility is insufficient. The evidence produced by the plaintiff must have "selective application" to one theory of causation. Howard, supra;Williams v. Bhoopathi, 474 So.2d 690 (Ala. 1985).
 "What was said in McClinton v. McClinton, 258 Ala. 542, 544-45, 63 So.2d 594, 597 (1952), is appropriate in this case:
 " 'Proof which goes no further than to show an injury could have occurred in an alleged way, does not warrant the conclusion that it did so occur, where from the same proof the injury can with equal probability be attributed to some other cause.'
 "But a nice discrimination must be exercised in the application of this principle. As a theory of causation, a conjecture is simply an explanation consistent with known facts or conditions, but not deductible from them as a reasonable inference. There may be two or more plausible explanations as to how an event *Page 1080 happened or what produced it; yet, if the evidence is without selective application to any one of them, they remain conjectures only." [Emphasis added.]
 "(Quoting Southern Ry. Co. v. Dickson, 211 Ala. 481, 486, 100 So. 665, 669 (1924). See, e.g., McKinnon v. Polk, 219 Ala. 167, 168, 121 So. 539, 540 (1929) (a case involving a suit for personal injuries allegedly caused by the negligence of the plaintiff's physician))."
Howard at 1020.
Generally, a plaintiff must establish these prima facie elements by introducing expert testimony. Therrell v.Fonde, 495 So.2d 1046 (Ala. 1986); Rosemont, Inc. v.Marshall, 481 So.2d 1126 (Ala. 1985). An exception to the general rule requiring expert testimony in medical malpractice suits obtains in cases where the want of skill or lack of care is so apparent as to be within the comprehension of the average layman and thus requires only common knowledge and experience to understand it. Therrell, supra;Rosemont, supra. The medical intricacies implicated in this case required the use of expert testimony. In determining whether the McGees' medical experts provided the necessary scintilla of evidence to present a jury question as to whether Dr. Bradford departed from the applicable standard of care, and whether such a departure proximately caused Bentley's cerebral palsy, we must review the testimony as a whole and not abstractly. Hines v. Armbrester,477 So.2d 302 (Ala. 1985). This Court has written:
 "[A] witness's isolated answer to a particular question, removed from the totality of that witness's testimony that explains or qualifies that answer, does not satisfy our scintilla-of-evidence sufficiency standard. See Creel v. Brown, 508 So.2d 684 (Ala. 1987) (Houston, J., concurring specially); Williams v. Robinson, 512 So.2d 58 (Ala. 1987) (Houston, J., dissenting, joined by Torbert, C.J., and Steagall, J.); and Wilson v. Alabama Power Co., 518 So.2d 105 (Ala. 1987) (Houston, J., concurring specially)."
Alabama Farm Bureau Ins. Co. v. Hunt, 519 So.2d 480
(Ala. 1987).
The McGees attributed the cause of Bentley's cerebral palsy to acute and chronic hypoxia, which, according to them, Dr. Bradford negligently failed to discover and to treat until it was too late. The McGees adduced expert evidence showing that hypoxia is a cause of cerebral palsy; that gestation periods exceeding 42 weeks can result in hypoxia, depriving the fetus of essential oxygen; that Mrs. McGee had completed her 42d week of pregnancy when she entered Jackson County Hospital; that after 42 weeks of gestation, proper medical treatment requires prenatal fetal monitoring, which Dr. Bradford failed to perform; and that once labor began, Dr. Bradford, knowing that Bentley was in fetal distress, performed a late cesarean section. Essentially, the McGees allege that Dr. Bradford proximately caused Bentley's affliction by negligently allowing Bentley to remain in his mother's womb for a dangerously protracted time, resulting in a long and short term deprivation of oxygen.
After a careful review of the whole record, resolving all doubts in favor of the McGees, we find that the McGees did present, through expert testimony, a scintilla of evidence indicating that Dr. Bradford breached the appropriate standard of care and that this breach probably caused Bentley's cerebral palsy.
 (a) Breach of the Appropriate Standard of Care
Drs. Huddleston, Faustin, and Davis testified that prenatal fetal testing should be performed beginning at the 42d week of pregnancy. Dr. Faustin's testimony as to the appropriate standard of care is as follows:
 "Q. In 1981 at the time this child was delivered, isn't it true that most of the obstetrical literature recommended antepartum testing only from the 42d week forward?
 "A. No. that's — in 1981 we were doing nonstress testing at 41 weeks.
 "Q. No, that's not my question. My question is in 1981 isn't it true that most of the obstetrical literature recommended nonstress testing beginning with the 42d week? *Page 1081 
"A. Probably true.
 "Q. All right, sir. And isn't it true that the recommendations of the American College of Obstetrics and Gynecology in 1981 recommended nonstress testing beginning at the 42d week?
"A. I would say yes.
 "Q. So the American College did not recommend doing nonstress testing in the 41st week or the 40th week, did it?
"A. That's true, probably true.
". . .
 "Q. Now, do you say that the standard of care required a nonstress test prior to her admission to the hospital?
 "A. The standard of care is that at the 42d week definitely you do a fetal monitoring.
"Q. Prior to the completion of the 42d week?
 "A. This is what we do. Okay. I agree with you. I agree with you from the beginning that most recommendations were made from 42d week. Okay. Forty-second week gestation as a definition of postdated, but we now, okay, do it from the 41st week because we understand that the risk increases progressively."
Mrs. McGee was admitted to the hospital at midnight on the morning of July 27. It is undisputed that Dr. Bradford did not perform fetal testing prior to admission. Bentley was born at 10:30 a.m. on July 27. Thus, the critical questions in determining a breach are 1) whether Bentley had reached a gestational age of 42 weeks prior to admission and 2) whether Dr. Bradford should have known this and, in accordance with accepted medical practice, should have performed fetal testing to discover and then to prevent health problems associated with post-term infants.
Fetal gestational age is derived by counting the weeks between the last menstrual period (LMP) and the delivery date. It was uncontradicted at trial that, due to the increased risk of fetal harm caused by pre-maturity or post-maturity, setting an accurate due date is extremely important. It was also uncontradicted that the patient's LMP determines when the due date should be set. Mrs. McGee testified that she told Dr. Bradford that her LMP occurred on September 8, 1980. Dr. Bradford testified that on one visit Mrs. McGee informed him of a September 8 LMP but that on another visit she told him it had occurred on October 8. In his efforts to determine Mrs. McGee's LMP, Dr. Bradford performed a pelvic examination and consulted with a radiologist, who conducted two ultrasound tests. An ultrasound is a technique used to estimate fetal age. The first ultrasound test, which was performed on January 22, 1981, indicated a fetal age of 14 weeks and confirmed an October 8 LMP. The second ultrasound test, which was performed later in the pregnancy, in April, indicated a fetal age of 28 weeks and confirmed a September 8 LMP. Based on the results of the pelvic examination and the first ultrasound test, Dr. Bradford estimated an October 8 LMP and upon that estimation calculated the due date for July 14. Dr. Huddleston, an obstetrician who testified on behalf of Dr. Bradford, stated that the appropriate standard of care requires a doctor to perform fetal testing once the fetus reaches an age of 42 weeks. He also testified that the procedure Dr. Bradford employed to estimate a due date was appropriate and that calculating the due date for July 14 was within the standard of care. Even upon consideration of the second ultrasound test, which indicated an older fetal age, and Mrs. McGee's belief that her LMP had occurred in September, Dr. Huddleston testified that Dr. Bradford's actions were "entirely appropriate."
Dr. Davis, another obstetrician who testified for Dr. Bradford, agreed that fetal testing should be performed at 42 weeks. But, he also agreed that Dr. Bradford did not breach the appropriate standard of care in his calculation of fetal age and in setting the due date. Dr. Davis testified that an estimated due date is a clinical judgment based on three factors: 1) menstrual history, 2) the size of the uterus calculated by performing a pelvic examination, and 3) results from ultrasound tests. He testified that Dr. Bradford properly considered all three factors. The following hypothetical *Page 1082 
questions posed by defense counsel and Dr. Davis's responses thereto are instructive:
 "Q. [A]ssume these facts to be true: that in December 1981, Sandra McGee was a 20-year old married female who had a positive pregnancy test. Assume further that on December 11, 1980, she first saw Dr. Bradford, a board certified family practitioner, for prenatal care. Assume further that Mrs. McGee had been on birth control pills until the previous June. Assume further that she gave a last menstrual period history to Dr. Bradford's nurse of October 8, 1980. Assume further that she also gave Dr. Bradford a conflicting last menstrual period of September 8 during this visit.
 "Assume further that Dr. Bradford spoke to the patient and performed an examination, and the examination revealed a uterine size of nine weeks. Assume further that the second prenatal visit occurred on January 22, 1981. Assume that Dr. Bradford ordered an ultrasound to be performed to assist him in determining the estimated date of confinement or due date.
 "Assume that the ultrasound was obtained that day; that the ultrasound was performed by a radiologist; that the radiologist was able to obtain satisfactory biparietal diameters and that the radiologist reported that the estimated fetal age by the ultrasound was 14 weeks. Assume that Dr. Bradford's examination of the patient on that day, January 22, revealed a uterine size of 14 to 15 weeks. Assume further that Dr. Bradford assigned a due date or estimated date of confinement at that time of July 14, 1981.
 "Let me stop you there. On the basis of those hypothetical facts, do you have an opinion as to whether or not the steps taken by Dr. Bradford in an effort to assign the estimated date of confinement were appropriate and within the standard of care?
"A. They were perfectly appropriate.
 "Q. I want to also ask you if you have an opinion as to whether or not the due date assigned of July 14 was appropriate clinical judgment and was within the standard of care?
"A. It was.
 "Q. Now, I want you to assume those facts I have given you and assume further these facts, please, sir: That following the January 22 visit, there were six more prenatal visits through April 16, 1981. On that day, Mrs. McGee was seen by Dr. Bradford complaining of lower abdominal pain and spotting. Assume further that Dr. Bradford obtained a second ultrasound to assist him in assessing the abdominal pain and spotting. Assume further that the ultrasound was again run by a radiologist and revealed a normal placenta, and an estimated fetal age of 28 weeks.
 "Assume further Dr. Bradford maintained the estimated date of confinement of July 14, 1981.
 "Again, let me stop you. Do you have an opinion based upon all the hypothetical facts I have given you as to whether or not it was appropriate and within the standard of care for Dr. Bradford to continue with the estimated date of confinement of June [sic; July?] 14, 1981?
 "A. I believe with the two sonars and the uterine size, the EDC of the 14th of July is appropriate.
 "Q. In light of all those facts, at that time, as of April 16, 1981, an EDC of July 14 was appropriate?
"A. Yes."
The McGees introduced into evidence testimony from two medical experts, Dr. Daniel Faustin, an obstetrician from New York, and Dr. Gary Meyers, a specialist in pediatric neurology and neonatology. Dr. Faustin testified that at the time of admission Mrs. McGee had completed her 42d week of pregnancy:
 "Q. All right. If the EDC was July 14, this pregnancy had not entered the 42d week at the time she was admitted to the hospital, had it?
"A. Yes, the pregnancy has completed the 42d.
"Q. The pregnancy has completed the 42d week? *Page 1083 
"A. (Deponent nodding head affirmatively.)
 "Q. All right. Your testimony is that with an EDC of July 14th, the pregnancy completed the 42d week?
 "A. On the 20 — on the 27th, yes. It's a matter of one day and really 20 — 20 — the 28th would have been the full 42d week completed, and I don't think a day makes a difference."
Thus, the appropriate standard of care required Dr. Bradford to perform fetal testing beginning at 42 weeks, which, he failed to do until July 27, when Bentley's gestational age had completed the 42d week. There is expert medical testimony that this constituted negligence. But, the plaintiffs' case does not end here. To recover damages, they must have established a causal connection between Dr. Bradford's negligence and Bentley's cerebral palsy. Specifically, did the delay in performing fetal testing, possibly by as much as six days, proximately cause Bentley's cerebral palsy?
 (b) Proximate Cause
At the outset, we note that our discussion is limited to the evidence indicating that chronic hypoxia proximately caused Bentley's cerebral palsy. The McGees premised their causation theory on the existence of acute and chronic hypoxia, but succeeded in establishing a causal connection only with respect to the chronic hypoxia. Dr. Faustin testified that Dr. Bradford committed "malpractice" by failing to perform a cesarean section sooner than July 27th. Allegedly, Dr. Bradford's late cesarean section during labor subjected Bentley to acute hypoxia and that acute hypoxia constituted a substantial factor in causing the cerebral palsy. Dr. Faustin did not testify, however, that Dr. Bradford's breach of the appropriate standard of care occurring during labor on the 27th caused the cerebral palsy. Moreover, Dr. Meyers testified that the "acute lack of oxygen occurred after [Bentley] was born," and that there was "no way to be certain" whether Bentley suffered acute hypoxia during the labor process. The record does not indicate, and the McGees do not argue, that Dr. Bradford breached the appropriate standard of care after Bentley's birth. With regard to their causation theory premised on acute hypoxia, the McGees failed to establish a scintilla of sufficient evidence — that is, evidence by expert testimony — showing that the negligence complained of probably caused the acute hypoxia, and that it, in turn, caused the cerebral palsy. Accordingly, we focus on the sufficiency of the evidence introduced at trial indicating a causal connection between Dr. Bradford's allegedly negligent pre-natal care and the chronic hypoxia.
Dr. Faustin testified that at the time of admission Mrs. McGee had completed her 42d week of pregnancy. With regard to the correlation between an overdue pregnancy and the risk of hypoxia, Dr. Faustin testified:
 "Q. At what point in time does it enter that high-risk period, 43rd week?
 "A. Generally — generally forty-two weeks, the 42d week is the clear definition of the postdated gestation, but this term is described as 37, 38 to 42, but the fetal risk does not become so high from one to another. Let's say, for instance, you reach 42 weeks, and the next day the risk is tremendous. We believe that this is a progressive increase, and from the 40th week of gestation going to 41 weeks, we like to see that those fetuses are monitored because definitely the risk of — of hypoxia increases once you are gone beyond the 40 weeks, so we'd like to see — to do prenatal antepartum fetal monitoring starting about 41 weeks." (Emphasis added.)
Dr. Meyers diagnosed Bentley's illness as cerebral palsy and attributed its cause to hypoxia. Pertinent portions of Dr. Meyers's testimony that support the McGees' theory of causation are as follows:
 "Q. And what is the relationship — if there is a relationship — known in medical science to post-term maturity and the increased risk of uteroplacental insufficiency?
"A. The risk increases for the post-term. *Page 1084 
". . .
 "Q. Let me ask it bottom line if I can. Is the risk for uteroplacental insufficiency increased or decreased with a post-term maturity?
"A. It increases.
". . .
 "Q. Have you seen any evidence in the records that you have reviewed of hypoxia or lack of oxygen with regard to Bentley?
"A. Yes. I believe that was present.
 "Q. What type of hypoxia have you seen through your review of the records?
 "A. I think there was a combination of chronic and also acute.
 "Q. So we can explain this to the jury, can you see this board, Doctor?
"Doctor, what is hypoxia?
"A. When you have low oxygen.
"Q. Is oxygen essential to the fetus?
"A. Yes.
"Q. How does the fetus receive oxygen?
 "A. Normally, it's transferred across the placenta to the bloodstream."
". . .
 " Q. Now, with regard [to] the chronic hypoxia, what is there about Bentley's chart that indicates that to you?
 "A. The most common cause of cerebral palsy is some sort of chronic hypoxia.
". . .
 "Q. Doctor, with regard to cerebral palsy, have you found that there is a familial trait in either Sandra's or in Mark's family that would indicate that as being a potential cause of Bentley's condition?
"A. There is no indication.
 "Q. Or any trauma or injury suffered by the mother while she was carrying Bentley that would indicate the cause of that condition?
"A. There is no history.
 "Q. Or any congenital abnormality that Sandra may have had or that Bentley may have had that would cause the cerebral palsy?
"A. There is no indication of that.
 "Q. From your review of the records and Bentley, would it be fair to say that you believe that a combination of chronic and acute hypoxia most probably caused this condition?
"A. Yes, sir.
"Q. Hypoxia, again, is lack of oxygen; correct?
"A. Yes, sir.
 "Q. Have you seen in the records there have been discussions of uteroplacental insufficiency?
"A. Yes, sir.
"Q. Is that a cause of hypoxia?
"A. That can be, yes, sir.
"Q. Can that be a cause of chronic hypoxia?
"A. Yes, sir."
". . .
 "Q. Have you found in your review of the records chronic hypoxia and acute hypoxia?
"A. Yes.
 "Q. Do you have an opinion as to whether either or both of those conditions are related to Bentley's present condition of cerebral palsy and psychomotor retardation?
"A. I think both of them are related.
 "Q. Are they related to be a probable cause of those conditions?
"A. I believe so.
 "Q. With regard to the cause of the hypoxia, have you seen anything in the records to indicate — before I ask you, let me just show it to you.
 "On the discharge summary from Dr. Bradford, which is in evidence as Plaintiffs' Exhibit 14, you also saw a copy of this chart you reviewed; correct?
"A. Yes.
 "Q. It says 'admitting diagnosis, term birth, living child, inter-uterine [sic] distress secondary to uteroplacental insufficiency and also secondary to maternal hypertension.' Have I read that correctly?
"A. Yes, sir.
 "Q. You have seen references to uteroplacental insufficiency; correct?
"A. I have seen that term; yes, sir. *Page 1085 
 "Q. Do you have an opinion as to whether the chronic and acute or only one or the other could be related to what Dr. Bradford found as the uteroplacental insufficiency?
"A. I don't understand that question.
 "Q. Do you have an opinion as to the relationship between the uteroplacental insufficiency and the chronic or acute hypoxia?
 "A. Uteroplacental insufficiency is associated with chronic hypoxia.
 "Q. Have you seen anything else in the record that you can put your finger on that would be associated with those two conditions?
"A. No.
"Q. But we do see that; correct?
"A. Yes, sir.
 "Q. From your knowledge and experience in treating patients with cerebral palsy and psychomotor retardation and in your reading of the literature, besides the uteroplacental insufficiency, the chronic and acute hypoxia, have you seen anything in the records that would indicate any other potential cause of Bentley's condition?
"A. No."
Dr. Davis's testimony substantiates Dr. Meyers's:
 "Q. And are you satisfied from looking at this chart that Bentley McGee suffered from hypoxia?
"A. Absolutely.
"Q. At some point?
"A. Absolutely.
". . .
 "Q. Isn't it correct that post-term maturity is a cause — can be a cause — of uteroplacental insufficiency?
"A. Yes.
 "Q. Have you seen any other indication in the prenatal chart, in the hospital chart, in the Huntsville Hospital chart, of another potential cause of uteroplacental insufficiency in this mother?
 "A. No. But I will state that many times we have things happen we can't explain."
The McGees' explanation for the cause of Bentley's cerebral palsy can be summarized as follows: Bentley was a post-term baby who had completed 42 weeks of gestation at birth; Dr. Bradford should have performed fetal testing prior to the end of the 42d week of pregnancy to detect signs of fetal oxygen depletion; the prolonged pregnancy resulted in uteroplacental insufficiency, or, in layman's terms, a poor exchange of oxygen between the mother and the fetus; the uteroplacental insufficiency led to chronic hypoxia and, consequently, the oxygen-starved Bentley suffers cerebral palsy today. This explanation is more than a mere conjecture. The evidence established through Drs. Faustin, Huddleston, Meyers, and Davis has selective application to this one theory. Their testimony constituted a scintilla of evidence that Dr. Bradford's alleged negligence probably caused Bentley's cerebral palsy.
For the foregoing reasons, the rulings of the trial court are affirmed, and this cause is remanded for a new trial as to the claims against Dr. Bradford.
AFFIRMED AND REMANDED.
TORBERT, C.J., and MADDOX, ALMON, SHORES, BEATTY, ADAMS and STEAGALL, JJ., concur.
[1] See John Crane-Houdaille, Inc. v. Lucas,534 So.2d 1070 (Ala. 1988), for a discussion concerning the appealability of an order denying a J.N.O.V. but also granting a new trial.